UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAULA MARAS-ROBERTS,                  ) | | |
| Plaintiff,           ) | | |
| ) | | |
| vs.                   ) | 1:05-cv-1148-SEB-JMS | |
| ) | | |
| DONALD R. PHILLIPPE, Anderson City   ) | | |
| Court Judge, in his individual capacity,       ) | | |
| Defendant.           ) | | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 57] filed by Defendant, Anderson City Court Judge Donald R. Phillippe ("Judge Phillippe"), pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Paula Maras-Roberts ("Maras-Roberts"), an attorney and former employee of the Anderson City Court, brought this action pursuant to 42 U.S.C. § 1983, alleging that Judge Phillippe unlawfully terminated her employment in retaliation for her exercise of her First Amendment right to speak on a matter of public concern. In his motion for summary judgment, Judge Phillippe asserts that Maras-Roberts's free speech interests are not implicated because her speech occurred in her capacity as a government employee, and such communications are not protected by the First Amendment. See Garcetti v. Ceballos, 126 S.Ct. 1951 (2006). For the reasons detailed in this entry, we hold that Maras-Roberts's speech was, indeed, made in her capacity as a public defender, not as a private citizen, and thus was not protected by the First Amendment. We therefore GRANT Defendant's Motion for

Summary Judgment.

## Factual Background[1]

Judge Phillippe has served on the Anderson City Court in Madison County, Indiana, since 1972. Judge Phillippe is the sole judge of that court and is responsible for hiring court personnel, including public defenders. Phillippe Dep. at 30, 38.

In 2004, Maras-Roberts, who is a licensed Indiana attorney, was working in an administrative capacity for the Elwood City Court and also sat as the judge *pro tem* in the Anderson City Court. Late in 2004, Maras-Roberts was contacted by Jana Thornburg ("Thornburg"), court administrator of the Anderson City Court, concerning a vacant public defender position. Following a series of informal discussions between Thornburg and Maras-Roberts, Judge Phillippe interviewed Maras-Roberts for the position.

---

[1] We are compelled to note at the outset our frustration with the organization of Maras-Roberts's response brief relating to the statement of facts. Rather than organize the evidence in a temporal or narrative structure – so that the court could easily follow Maras-Roberts's version of events – Maras-Roberts's counsel has confusingly structured the statement of facts by deposition (including a large number of wholly irrelevant facts), leaving to the court the task of amalgamating the scattershot testimony into a cohesive narrative. The facts as presented are disjointed and quite difficult to integrate. Moreover, all of Maras-Roberts's objections to Judge Phillippe's factual assertions are catalogued in a single footnote, along with cryptic parentheticals, such as "(in conflict with Ms. Maras-Roberts' testimony)," but with no further specificity or citation to the evidentiary record. As a result, it has been exceedingly difficult to determine what the supposed inaccuracy of Judge Phillippe's factual assertions might be.

Judge Phillippe asserts in his Reply that Maras-Roberts's Response is in violation of Local Rule 56.1(b), which requires that factual disputes "be supported by appropriate citations to [the record]." Maras-Roberts rejoins in her Surreply that her Response "has not done less than is required" under the Local Rules, citing her numerous references to deposition testimony in her statement of facts. Pl.'s Surreply at 2. We have proceeded with our analysis based on the parties' briefs, which was no small task, wishing all the while that Maras-Roberts's Response brief had been organized to highlight the factual disputes with some specificity and citation.

Thornburg also participated in the interview. Maras-Roberts Dep. at 40-41. Maras-Roberts was eventually hired,[2] and began working as a public defender in the Anderson City Court on or about January 4, 2005.

*The Infraction Probation Dispute*

As Judge, Judge Phillippe would decide whether to place certain offenders on probation as punishment for the infractions for which they were found guilty. If an offender violated the terms of probation, Judge Phillippe issued a notice to appear in court; if the offender failed to appear, Judge Phillippe issued an arrest warrant for failure to appear. On this basis, some offenders were arrested for contempt of court. Def.'s Mem. ¶¶ 22-25.

It was Maras-Roberts's opinion that Judge Phillippe's practice of placing individuals on probation for infractions contravened Indiana statutory law. Soon after her employment with the court began, Maras-Roberts raised this issue with Judge Phillippe during a conversation between them in the courtroom. Def.'s Mem. ¶ 30; Maras-Roberts Dep. at 72-73; Phillippe Dep. at 74. Judge Phillippe provided Maras-Roberts with a copy of the statute upon which he relied. Phillippe Dep. at 74.

Unconvinced, Maras-Roberts submitted, by e-mail, a list of questions relating to

---

[2] Judge Phillippe testified that he initially hired Maras-Roberts on a probationary basis, in accordance with "the personnel policy from the city." Def.'s Mem. at 3, citing Phillippe Dep. at 76. Maras-Roberts rejoins that Judge Phillippe's assertion is "unsupported and in conflict with Ms. Maras-Roberts's testimony and documentary evidence" (Pl.'s Resp. at 3 fn. 1), and states that documents she received from the City upon beginning her job indicated that there was no probationary period. Maras-Roberts Dep. at 84.

this matter to Darren Bedwell ("Bedwell") of the Indiana Public Defender Council ("IPDC")[3] in January or February 2005.[4]  Maras-Roberts signed the e-mail as "PMRoberts, PD [Public Defender], Anderson City Court."  Def.'s Ex. E.  On February 15, 2005, Bedwell responded by letter to Maras-Roberts with answers to her questions, which appeared to support her position that Judge Phillippe's practice was illegal.  Maras-Roberts Dep. at 61; Compl. Ex. A.

On March 16, 2005, Maras-Roberts provided a copy of Bedwell's response to Thornburg for delivery to Judge Phillippe.  Thornburg left the Bedwell letter on Judge Phillippe's desk.  The next morning, Judge Phillippe read the letter prior to taking the bench to conduct court proceedings.  In his deposition, Judge Phillippe testified that he planned to discuss the letter with Maras-Roberts after court had adjourned for the day, but that "she took off" before he was able to.  Phillippe Dep. at 85.

On March 31, 2005, in Judge Phillippe's chambers, Maras-Roberts and Judge Phillippe finally had occasion to discuss the issue and the IPDC letter.  Judge Phillippe expressed to Maras-Roberts his view that the IPDC letter was "prejudiced," based on what he considered to be mischaracterizations in Maras-Roberts's questions.  Id. at 91-92.

On April 3, 2005, Maras-Roberts sent an e-mail to Judge Phillippe following up on

---

[3] The IPDC provides a variety of support services to public defenders in Indiana.  Among the assistance available from the IPDC, public defenders may submit legal questions in order to help resolve pending cases or for general background information.  Cunningham Dep. at 24-27.

[4] This course of action was suggested to Maras-Roberts by David Alger, a Commissioner in Madison County Superior Court and a friend and former colleague of Maras-Roberts.  Alger Dep. at 20.

their March 31st conversation and raising an unrelated issue involving errors in a plea agreement.  In the e-mail, Maras-Roberts stated:

> I took from our discussion that I was not to contact the [IPDC] for advice without clearing it with the Court first.  I may have gotten the wrong impression.  If, however, my impression was correct, then I am alarmed. Representing my clients with vigor means that I must make strategic decisions, in consultation with them, which are in their best interests.  It does not mean that I may not explore legal avenues with parties such as the [IPDC] without fear of repercussions by my employer.  This has created a chilling effect upon my practice.[5]

Further, Maras-Roberts expressed her concern that, because Judge Phillippe regarded the IPDC as "prejudiced," he would consider its opinions "through a jaundiced eye" and Maras-Roberts's "representation of [her] clients will be compromised as a result."  Id.  After reiterating her legal reasoning concerning orders of probation for infractions, she concluded:

> More important to me . . . is doing my best to do the right thing for my clients. I wish to represent them to the best of my ability without fear of reprisal for seeking advice from the knowledgeable about that representation. . . . My concept of public defense is to represent the individual client first and foremost. When, however, one encounters systemic practices that arguably are not legal and may hurt the client, then one is obligated to challenge those practices.  I am unable to do less. . . . Respectfully, Paula Maras-Roberts, Attorney 10164-53A[6]

The following day, April 4, 2005, Judge Phillippe read Maras-Roberts's email.  On April 5, 2005, he called Maras-Roberts and Thornburg to his chambers for a meeting, at

---

[5] Def.'s Ex. C.

[6] Id.

which Judge Phillippe asked for Maras-Roberts's resignation, citing a communications gap between them. Phillippe Dep. at 86. Maras-Roberts refused and stated that she was concerned she could be sued for malpractice by her current clients if she resigned. Judge Phillippe then informed Maras-Roberts that her employment was terminated. Phillippe Dep. at 86-87; Thornburg Dep. at 48.

Judge Phillippe asserts that he terminated Maras-Roberts's employment because of communications problems between them, mistakes she had made on plea agreements, and the fact that she did not get along with court staff. Phillippe Dep. at 101. Thornburg testified that she had received complaints from court staff about Maras-Roberts's rude conduct towards them. Judge Phillippe was aware of certain staff issues prior to Maras-Roberts's termination. Thornburg Dep. at 24-27; Phillippe Dep. at 102. Judge Phillippe testified that he did not feel compelled to mention these staff problems to Maras-Roberts when he terminated her employment, because he then considered Maras-Roberts to be a probationary employee. Phillippe Dep. at 102.

On August 2, 2005, Maras-Roberts filed suit against Judge Phillippe in his individual capacity, alleging that he unlawfully terminated her employment in retaliation for her speech on a matter of public concern as an exercise of her First Amendment rights. Compl. ¶¶ 1, 31. Judge Phillippe filed a Motion for Summary Judgment on October 19, 2006, seeking judgment as a matter of law based on the fact that Maras-Roberts's speech was made in the context of her role as a public employee and was not activity protected by the First Amendment. We turn now to an analysis of whether

6

Maras-Roberts's speech was protected by the First Amendment.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears

the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).

## II. Garcetti Analysis of a Retaliatory Termination Claim

"Individuals do not relinquish their First Amendment rights to free speech by accepting employment with the government. Nevertheless, the government as an employer has an interest in conducting its affairs as efficiently and effectively as possible. As a consequence, public employees do not have the unfettered right to express themselves . . . and courts must give due weight to the government's interest in efficient employment decisionmaking when evaluating First Amendment retaliation claims." Cygan v. Wisconsin Dep't of Corr., 388 F.3d 1092, 1098 (7th Cir. 2004). In analyzing a

First Amendment retaliation claim arising under § 1983, we initially consider whether a plaintiff's speech was constitutionally protected. If so, the plaintiff must establish that the speech was a substantial factor motivating her termination. Then, defendants may show that the plaintiff would have been fired even in the absence of the speech. Id.; Sullivan v. Ramirez, 360 F.3d 692, 692 (7th Cir. 2004).

First, then, we address the question of whether Maras-Roberts's speech is entitled to constitutional protection. Under Garcetti, "the threshold inquiry is whether the employee was speaking as a citizen" or as a public employee. Spiegla v. Hull ("Spiegla II"), ___ F.3d ___, 2007 WL 937081 at *2 (7th Cir. Mar. 30, 2007). The Garcetti Court ruled that "the controlling factor" is whether a public employee's expressions were made pursuant to his or her official duties as a public employee: "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 126 S.Ct. at 1959-60. Only upon a determination that a plaintiff was speaking as a citizen need we inquire into the content of the speech. See Spiegla II at *4 (citing Mills v. City of Evansville, 452 F.3d 646, 647-48 (7th Cir. 2006); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).[7]

---

[7] Contrary to Maras-Roberts's assertion that the Court's holding in Garcetti is "substantively identical" to prior Seventh Circuit and Supreme Court precedent concerning First Amendment retaliation, it is patently clear that Garcetti's impact has significantly altered the landscape of such jurisprudence in the Seventh Circuit. This conclusion is made undeniable by the Seventh Circuit's reconsideration of the plaintiff's claim in Spiegla I and Spiegla II. In Spiegla v. Hull ("Spiegla I"), 371 F.3d 928 (7th Cir. 2004), the court held that the plaintiff, a
(continued...)

Maras-Roberts contends that she was not speaking in her capacity as a public employee. She had been speaking out publicly to other citizens about the probation infraction issue for several years before being hired for the public defender position; it was, she claims, an issue of general interest and discussion among the legal community of which she was a member.[8] Pursuant to the holding in Garcetti, however, the fact that a plaintiff articulated "views inside of his office, rather than publicly, is not dispositive." 126 S.Ct. at 1959.

Unlike Garcetti – in which the employee did not dispute that his speech was pursuant to his job duties – Maras-Roberts does not concede that her role as a public

---

[7](...continued)
state correctional officer, had engaged in protected speech when she reported a possible security lapse at a correctional facility where she was employed. On remand, following a trial, a jury awarded the plaintiff $210,000 in damages, and the defendants appealed. While the defendants' appeal was pending, the Supreme Court decided Garcetti, prompting the Seventh Circuit in its subsequent ruling (Spiegla II) to reexamine the soundness of its prior ruling in light of Garcetti and to vacate its previous judgment in light of the intervening Supreme Court decision. Spiegla II, 2007 WL 937081 at *1. The Seventh Circuit interpreted Garcetti's effect as follows:

> Prior to Garcetti, we considered the "content, form, and context" of the employee's speech to determine whether the employee spoke as a citizen on a matter of public concern, with content being the most important factor. . . . After Garcetti, however, the threshold inquiry is whether the employee was speaking as a citizen; only then do we inquire into the content of the speech. Garcetti made clear that public employees speaking "pursuant to their official duties" are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech.

Spiegla II, 2007 WL 938081 at *4.

[8] In support of this assertion, David Alger (a former public defender) testified that the issue had been discussed "a number of times" among a group of attorneys including himself, Maras-Roberts, and other public defenders. Alger Dep. at 16-17. Maras-Roberts also testified that she had researched the issue independently before taking the public defender position with Judge Phillippe. Maras-Roberts Dep. at 31-32.

10

defender encompassed the speech at issue here.  She maintains that her duties as a public defender consisted solely of advocacy on behalf of *individual* criminal defendants.[9]  See Kurowski v. Krajewski, 848 F.2d 767, 769 (7th Cir. 1988) ("Public defenders represent criminal defendants, and their loyalty as advocates runs to their clients, not to their employer."); Branti v. Finkel, 445 U.S. 507, 519 (1980) ("The primary, if not the only, responsibility of . . . [a] public defender is to represent individual citizens in controversy with the State.").  At the very least, Maras-Roberts argues, a question of fact exists as to this question, which, if true, precludes summary judgment.[10]  See Kodrea v. City of Kokomo, 458 F.Supp.2d 857, 867 (S.D. Ind. 2006).

Judge Phillippe rejoins that the duties of a public defender are established as a

---

[9] Maras-Roberts had not been provided either a job description (Def.'s Mem. at 3) or an employee manual delineating the expectations of her position (Pl.'s Resp. at 9).  However, the Garcetti Court noted that the lack of a formal job description is not dispositive, and that "[t]he proper inquiry is a practical one."  126 S.Ct. at 1961 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.").

[10] Maras-Roberts also cites an Indiana statute (Ind. Code § 33-23-12-1 *et seq.*) which states that "employees in the judicial branch of state government have the same rights guaranteed to Indiana citizens" and that, "[e]xcept where otherwise provided by state or federal law, a court employee may not be . . . discouraged from engaging in political activity."  She contends (without ever actually developing the argument) that this indicates that "the State has made an employment decision to disavow limits to court employees' rights simply because they are employed in that capacity."  Pl.'s Resp. at 28.  We are not persuaded by Maras-Roberts's conclusory argument on this point, noting that the text of this excerpted section of the statute is ambiguous and may be read as simply descriptive of current law regarding the balancing test for free speech claims of government employees (see Klunk v. County of St. Joseph, 170 F.3d 772 (7th Cir. 1999)).  Moreover, Maras-Roberts's skeletal argument, which is little more than a speculative assertion, is insufficient to preserve a claim.  See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

11

matter of law, citing among other sources the holding in <u>Branti</u> and an Indiana statute (Indiana Code § 33-40-2-1) which creates public defenders as a component of the state judicial system.  Judge Phillippe invokes Maras-Roberts's own words to make this point, specifically noting that she herself has indicated that she considered herself to be carrying out her official duties by advocating against placing defendants on probation for infractions.  Further, he maintains that her use of the IPDC as a resource was, itself, reflective of her role as a public defender, and in addition her conversations with him were not the sort of meetings available to private citizens.  Thus, Judge Phillippe argues, Maras-Roberts's "speech was inseparable from the performance of her job as a public defender for the Anderson City Court[.]" Def.'s Mem. at 16.

    We have our doubts about Judge Phillippe's assertion that the duties of a public defender are definitively established by statute and thus exist as a matter of law.  The dicta on which he relies in advancing this proposition do not support his claim; what tasks comprise Maras-Roberts's job duties remains a question of fact.  See <u>Kodrea</u>, 458 F.Supp.2d 857.  That said, we see no basis on which a reasonable jury could reach conclusion as a matter of fact that Maras-Roberts's speech was uttered by her in her capacity as a private citizen since, from all the uncontroverted evidence, it is clear that her speech occurred within the scope of her official duties as a public defender.  <u>Garcetti</u> holds that "[r]estricting speech that *owes its existence* to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." 126 S.Ct. at 1954 (emphasis added).  Here, no evidence establishes that

Maras-Roberts would have been permitted to seek the input of the IPDC but for her public employment or that, outside her role as public defender, she would have had personal access to Judge Phillippe (both in person and via e-mail) to voice her concerns.

Though Maras-Roberts's personal description of her job duties is not dispositive, it does inform our decision-making here.[11]  Maras-Roberts has characterized her request for services from the IPDC as a resource empowering her to "represent [her] clients with vigor."  She ended her e-mail to Judge Phillippe stating that "[m]y concept of public defense is to represent the individual client first and foremost.  When, however, one encounters systemic practices that arguably are not legal and may hurt the client, then one is obligated to challenge those practices.  I am unable to do less."  Clearly, Maras-Roberts considered her remarks to Judge Phillippe to be an important aspect of her advocacy obligations as *mandated* by her role as public defender.  Clearly, her conduct was not undertaken as a private endeavor disconnected from her public responsibilities.  Though her challenge to "systemic" practices (as Maras-Roberts has phrased it) may have been only one aspect of her work as a public defender, and certainly not the most important of her responsibilities, Spiegla II made clear that merely to "focus on 'core' job functions is

---

[11] We note that, in her deposition, Maras-Roberts stated, after the fact, that her speech with regard to the probation infraction issue "really wasn't my job, I realize."  Maras-Roberts Dep. at 128.  We view her characterization of her job description in her e-mail to Judge Phillippe as much more probative however, and thus have placed greater weight on that explication of her views.  See Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993) (all supporting the proposition that a plaintiff's self-serving statements, which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment).

13

too narrow [an approach] after <u>Garcetti</u>" when determining whether speech falls within a plaintiff's role as a public employee.  2007 WL 937081 at *5.  In crediting Maras-Roberts's description of her responsibilities to include systemic advocacy, we conclude with virtually no hesitancy that in her communications with Judge Phillippe on the cited issue, she spoke to him as a public defender.

     Moreover, the fact that Maras-Roberts may have had a longstanding personal interest in the probation infraction issue does not salvage her case.  As <u>Garcetti</u> held, "It is immaterial whether [a plaintiff] experienced some personal gratification from [his or her speech]; . . . First Amendment rights do not depend on . . . job satisfaction."  126 S.Ct. at 1960.  The fact that certain prosecutors as well as other public defenders may also have discussed this esoteric legal issue within the prosecutor's office is also immaterial, because "job talk" is not transformed into the sort of private speech with which the First Amendment is concerned; as Judge Phillippe aptly noted, "The prosecutor's room is not a public forum . . . such as a town hall; so speech taking place in this room could not easily be equated to a citizen's writing of a letter to the editor of a newspaper."  Def.'s Reply at 18.

     Having concluded, based on the uncontroverted facts underlying this dispute, that Maras-Roberts's remarks were made in her capacity as a public employee, we hold as a matter of law that her speech was not protected by the First Amendment.  Thus, we <u>GRANT</u> Defendant's Motion for Summary Judgment and shall enter judgment

accordingly.[12]  IT IS SO ORDERED.

Date: ___04/27/2007_____

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

David A. Arthur
INDIANA STATE ATTORNEY GENERAL
David.Arthur@atg.in.gov

Eric James Beaver
INDIANA STATE ATTORNEY GENERAL
eric.beaver@atg.in.gov

Patricia Orloff Erdmann
INDIANA STATE ATTORNEY GENERAL
Patricia.Erdmann@atg.in.gov

Robb Alan Minich
MICHAEL K. SUTHERLIN & ASSOCIATES
robbminich@hotmail.com

Michael K. Sutherlin
MICHAEL K. SUTHERLIN & ASSOCIATES, PC
msutherlin@michaelsutherlin.com

---

[12] There being no need to decide whether Judge Phillippe could have terminated Maras-Roberts's employment, even if her speech were protected (see Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)), we have left unaddressed the parties' arguments regarding the comparative conduct of prior public defenders and other court employees.